1
2
3
4
5
6
7

**KAZEROUNI LAW GROUP, APC**
Ryan L. McBride, Esq. (297557)
ryan@kazlg.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff*,
Michael Anthony

8
9

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| MICHAEL ANTHONY,<br><br>      **Plaintiff,**<br><br>         **v.**<br><br>**TWILIO INC.,**<br><br>      **Defendant.** | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227**<br><br> **JURY TRIAL DEMANDED** |

**INTRODUCTION**

1. Plaintiff MICHAEL ANTHONY ("Plaintiff") brings this action against Defendant TWILIO, INC. ("Defendant" or "Twilio") to secure redress for violations of the Telephone Consumer Protection Act ("TCPA").

2. Twilio is a cloud communications company that enables businesses to reach customers around the globe. In doing so, Twilio essentially bridges the gap between web-based applications and the telephone network. In providing this bridge, however, Defendant has been originating illegal robocall traffic.

3. As alleged with specificity herein, Defendant has initiated hundreds of calls to Plaintiff's cellular telephone ending in -555 ("Cell Phone") in violation of the TCPA.

4. Even though Plaintiff notified Defendant *countless times* that he registered his Cell Phone with the Do Not Call Registry, Defendant continually harassed him by transmitting unlawful text messages and making illegal call after illegal call via phone numbers that are registered to Defendant.

5. Although Plaintiff notified Twilio that it continually originated unlawful robocalls to his wireless number without consent, Twilio turned a blind eye and did nothing.

6. Plaintiff was therefore left with no choice but to file this action to stop the unsolicited and unlawful communications initiated by Twilio.

7. Through this action, Plaintiff seeks statutory damages and equitable relief to halt Defendant's illegal conduct, which has resulted in the invasion of privacy, harassment, aggravation, and disruption of his daily life.

8. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

9. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in its entirety.

10.     Unless otherwise stated, all the conduct engaged in by Defendant took place in the Northern District of California.

11.     Any violations by Defendant were knowing, willful, and intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

12.     Unless otherwise indicated, the use of Defendant's names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant's named.

//

### NATURE OF THE ACTION

13.     In 1991, Congress passed the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*, ("TCPA"), in response to complaints about abusive telemarketing practices.

14.     At the time of the TCPA's passage, the majority of illegal robo-calls were made "off-line" using pre-recorded voice messages.

15.     Thereafter, the Federal Communications Commission ("FCC") noted that advertisers seeking to make illegal robo-calls increasingly used computer programs to initiate calls as well as SMS text messages, instead of pre-recorded voice messages, to reach cell phone and "smart phone" users.[1]

16.     A Pew Research Center study conducted almost 10 years ago found that "[t]ext messaging is the most widely-used smartphone feature," and "is also the most frequently-used."[2]

17.     Indeed, in 2014, Americans sent over 2 ***trillion*** individual SMS and MMS

---

[1] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 31 F.C.C. Rcd. 88 (2016).
[2] http://www.pewinternet.org/2015/04/01/us-smartphone-use-in-2015/

KAZEROUNI
LAW GROUP, APC

messages.[3]

18.     As technology evolved and advertisers adapted to the ways it reached potential customers, the FCC made clear that the TCPA still governed.  Specifically, the FCC found that merely moving the process of robo-calling to auto-dialing computer programs, or using automated or pre-recorded text messages instead of a pre-recorded voice, did not place these practices outside the scope of the TCPA. Indeed, the FCC issued a number of declaratory rulings with respect to the TCPA liability of online services that permit the sending of illegal text messages via computer program.[4]

19.     Defendant Twilio is one example of a computer-based robo-calling service and automated text messaging service because it initiates or causes to be initiated ***millions*** of text messages and/or calls to cell phone users per month via computer program.

20.     Since it was first launched in 2007, Twilio's cloud-based robo-calling, automated text messaging, and auto dialing service has grown to provide its service to hundreds of advertisers.  And as such, Twilio has initiated or caused to be initiated countless text messages and calls to the cell phones of thousands of unfortunate consumers, like Plaintiff, without express consent and in violation of the TCPA.[5]

21.     This lawsuit seeks to hold Twilio accountable for its integral role in initiating or causing to initiate the relentless unlawful telemarketing that has plagued Plaintiff for years.

---

[3] *See* Dr. Robert F. Roche & Kathryn Malarkey, CTIA's Annual Wireless Industry Indices: Annual Wireless Survey Results: A Comprehensive Report from CTIA Analyzing the U.S. Wireless Industry, CTIA, at 144 (Sept. 2015).
[4] *See, e.g.*, In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961 (2015).
[5] *See, e.g.*, Twilio Inc., Programmable SMS, https://www.twilio.com/sms; Jason Kincaid, Twilio: Powerful API for Phone Services That Can Recreate GrandCentral's Core Functional in 15 Lines of Code, TechCrunch (Nov. 20, 2008), http://techcrunch.com/2008/11/20/twiliopowerful-api-for-phone-services-that-can-recreate-grandcentral-in-15-lines-of-code/.

**JURISDICTION AND VENUE**

22.    Jurisdiction is proper under 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute.

23.    Defendant is subject to this Court's personal jurisdiction because it provides and markets its services within this district.

24.    Pursuant to 28 U.S.C. § 1391(b) and (c), venue is proper because Defendant is deemed to reside in any judicial district in which it is subject to the Court's personal jurisdiction.

**PARTIES**

25.    Plaintiff is an individual and citizen of the Commonwealth of Pennsylvania.

26.    Upon information and belief, Defendant is a domestic corporation with its principal place of business located in San Francisco, California.

**THE TCPA**

27.    The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).

28.    In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication.[6]

29.    "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."[7]

30.    The FCC has explained that calls motivated in part by the intent to sell

---

[6] *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).
[7] *Golan*, 788 F.3d at 820 (citing 47 C.F.R. § 64.1200(a)(2)(iii); 47 C.F.R. § 64.1200(f)(12); In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C. Rcd at 14098 ¶ 141, 2003 WL 21517853, at *49).

property, goods, or services are considered telemarketing under the TCPA.[8]

31.    This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call or in the future.[9]

32.    In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services" constitute telemarketing under the TCPA.[10]

33.    In an action under the TCPA, a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice."[11]

34.    In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express written consent" for such calls to wireless numbers.[12]

35.    To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent….and having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates."[13]

36.    If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent.[14]

37.    As held by the United States Court of Appeals for the Ninth Circuit:

_____

[8] See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003).
[9] Id.
[10] See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, ¶ 136 (2003).
[11] Breslow v. Wells Fargo Bank, N.A., 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), aff'd, 755 F.3d 1265 (11th Cir. 2014).
[12] See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C.R. 1830, 1838 ¶ 20 (Feb. 15, 2012) (emphasis omitted).
[13] In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C.R. 1830, 1837 ¶ 18, 1838 ¶ 20, 1844 ¶ 33, 1857 ¶ 66, 1858 ¶ 71 (F.C.C. Feb. 15, 2012).
[14] See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7991-92 (2015) (requiring express consent "for non-telemarketing and non-advertising calls.")

1  "Unsolicited telemarketing phone calls or text messages, by their nature, invade the
2  privacy and disturb the solitude of their recipients. A plaintiff alleging a violation
3  under the TCPA 'need not allege any additional harm beyond the one Congress has
4  identified.'"[15]

5  **To "Make" or "Initiate" a Call Under the TCPA**

6      38.     The TCPA does not define the term "make," but the question of who can
7  be held liable for violations of the TCPA was addressed extensively in 2015.[16]

8      39.     The 2015 FCC Order states that "one can violate the TCPA either by
9  'taking the steps necessary to physically place a telephone call,' or by 'being so
10  involved in the placing of a specific telephone call as to be deemed to have initiated
11  it.'"[17]

12      40.     And in making this determination, the adjudicator must "look to the
13  totality of the facts and circumstances surrounding the placing of a particular call."[18]

14      41.     In 2016, the FCC weighed in on the question of whether text broadcasters
15  could be "senders" of text messages under § 227(b)(1) of the TCPA.[19]

16      42.     The FCC clarified that "text broadcasters can be liable for TCPA
17  violations" based on an analysis of the "totality of the facts and circumstances
18  surrounding the placing of a particular call."[20]

19      43.     As one court put it, "[t]he 'totality of the circumstances' approach…will
20  not provide easy answers in close cases. But it makes one thing clear: a provider of
21  auto-dialing services cannot blithely sit back and blame his customers for any TCPA

22

23
_____

24  [15] *Van Patten v. Vertical Fitness Grp.*, No. 14-55980, 2017 U.S. App. LEXIS 1591, at
25  *12 (9th Cir. May 4, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549
    (2016) (emphasis original)).
26  [16] *See* Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC
    Red. 7961, 7890 (2015) ("the 2015 FCC Order").
27  [17]  *Id.* at 7890 ¶ 30 (quoting DISH Network, 28 FCC Red. at 6583 ¶ 27).
    [18] *Id.*
28  [19] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of
    1991, 31 F.C.C. Rcd. 88, 90 (2016).
    [20] Id. at 91 (emphasis omitted).

violations that result from their use of his service."[21]

44.    Like the knowledge Twilio obtained through Plaintiff's communications begging for Twilio to stop contacting him, Courts have refused to dismiss suits where the defendant knew that illegal activity was underway.

45.    For instance, in *Hurley v. Messer*, the district court refused to dismiss TCPA claims against VoIP providers who knew of the caller's illegal conduct and could have stopped it, but nevertheless permitted robocalls to be broadcast through their systems.[22]

46.    The *Hurley* court analyzed the factors listed in the 2015 FCC Order and concluded that the allegations "state a plausible claim that [the VoIP providers] offered a calling platform and 'knowingly allowed [their] client(s) to use that platform for unlawful purposes.'"[23]

47.    This is precisely what happened in this case.  Regrettably, Twilio *knowingly* allowed its customers to harass Plaintiff for years and was intimately involved in this malfeasance.

### FACTUAL ALLEGATIONS

### Twilio's Business Model

48.    Twilio offers a variety of products and services, including a cloud-based automated telecommunications platform enabling the sending of automated text messages *en masse* to consumers.

49.    Customers of Twilio access the technology platform via an application program interface ("API") that permits them to programmatically create pre-recorded

---

[21] *Cunningham v. Montes*, 378 F.Supp.3d 741, 747–48 (W.D. Wis. 2019). *See also Hurley v. Messer*, 2018 WL 4927218, at *2 (S.D. W.Va. Oct. 10, 2018) ("whether or not [the defendant] may be held liable will depend upon a totality of the circumstances analysis, which is not appropriate on a motion to dismiss given the allegations in this case."); *Couser v. Pre-paid Legal Services, Inc*., 994 F.Supp.2d 1100, 1103 (S.D. Cal. 2014) ("Whatever the true and exact relationship between [defendant] and its customers is, the Court finds it all too fact intensive ... to be resolved at the motion to dismiss phase in [defendant's] favor.")
[22] 2018 WL 4854082 (S.D. W.Va. Oct. 4, 2018).
[23] *Id*. at *4 (quoting 2015 FCC Order ¶ 30).

messages that are subsequently and automatically transmitted by Twilio.

50.    According to its website, Twilio's programmatic text messaging service provides their mobile telemarketing customers with an "SMS API" which interfaces to "cloud software" capable of automatically sending "billions of SMS messages" to the cellular telephones of mobile subscribers via "more than 900 global carriers."

51.    Twilio's SMS API is accessed by Twilio users through a "client program" that incorporates the SMS API. A client program is a software program used by Twilio's customers incorporating the SMS API software to communicate with Twilio's platform technology. The SMS API incorporated into the client program enables Twilio's telemarketing customers to create message text content or portions of content. Telemarketing customers can then upload and store that content on Twilio's hosted platform. This content is subsequently used by Twilio to automatically and programmatically create, build, copy and initiate any number of SMS messages to be sent to a list of cellular telephone numbers containing that same content—the precise definition of an automated text message program. Other basic functions enabled by the SMS API include the ability to upload the list of cellular telephone numbers to be stored for the automated text messaging program and an automatic means to determine when text messages using the provided content are to be created, built, copied and sent automatically to the stored list of cellular telephone numbers

52.    The message content provided to Twilio via the SMS API, is simply a template for the textual content portion of a message that Twilio automatically and repeatedly copies and builds into each individual text message it automatically initiates to cellular telephones. The message content is a pre-recorded message that is stored in Twilio's system to be subsequently and repeatedly used to automatically create, build, and initiate text messages that are then automatically sent by Twilio *en masse* to cellular telephone subscribers.

53.    Client programs that incorporate the Twilio SMS API can be written in a number of programming languages, and are extremely simple. The SMS API enables

the client program to communicate remotely with Twilio's automated text messaging platform—the platform providing the extensive computational resources needed to automatically create, build and initiate any number of text messages to cellular subscribers *en masse*.

**Twilio's Intimate Involvement In Transmitting the Unlawful Telemarketing**

54.    In 2016, the FCC ruled on the question of whether text broadcasters could be "senders" of text messages under § 227(b)(1) of the TCPA.[24]

55.    The FCC clarified that "text broadcasters can be liable for TCPA violations" based on an analysis of the "totality of the facts and circumstances surrounding the placing of a particular call."[25]

56.    As part of the totality of the circumstances test, a court will consider: "1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA," as well as whether a text broadcaster "knowingly allowed its client(s) to use that platform for unlawful purposes."[26]

57.    Considering the totality of the circumstances, Twilio makes, initiates, and/or causes to be initiated the calls and text messages transmitted to Plaintiff within the meaning of the TCPA because: (1) Twilio software and servers, ***not the user***, automatically determines what number a text message will come from; (2) Twilio software and servers, ***not the user***, automatically generates the list of numbers that a message will be sent ***to***; (3) Twilio's software, ***not the user***, automatically dials those numbers and/or sends a text message to those numbers; (4) Twilio's software and server, ***not the user***, assembles and constructs the text message itself; and (5) the only role that the user plays in the process (writing client code to accesses Twilio's API

---

[24] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 31 F.C.C. Rcd. 88, 90 (2016).
[25] *Id*. at 91 (emphasis omitted).
[26] *Id*.

and servers) is removed by services offered by Twilio itself, such as the Developer Gallery (which provides a developer that will write code, instead of the user) and Twimlets (which automatically generates for the user, the client code). As such, when considered as a whole, Twilio's platform and related services so limit the role that a user plays in sending a text message, Twilio itself makes, initiates, and/or causes to be initiated the texts within the meaning of the TCPA. This conclusion is made clearer when Twilio's platform and related servers are considered in the context of the goals of the TCPA because the Twilio's SMS API is expressly intended to permit mass text messaging campaigns, which the TCPA was intended to prevent.

58. Twilio acknowledges that its platform technology allows mass text messaging campaigns that violate the TCPA: "We face a risk of litigation resulting from customer misuse of our software to send unauthorized text messages in violation of the Telephone Consumer Protection Act. Text messages may subject us to potential risks, including liabilities or claims relating to consumer protection laws. For example, the Telephone Consumer Protection Act of 1991 restricts telemarketing and the use of automatic SMS text messages without proper consent. This has resulted in civil claims against the Company and requests for information through third-party subpoenas. The scope and interpretation of the laws that are or may be applicable to the delivery of text messages are continuously evolving and developing. If we do not comply with these laws or regulations or if we become liable under these laws or regulations due to the failure of our customers to comply with these laws by obtaining proper consent, we could face direct liability."[27]

**Twilio's Long History of Unlawful Telemarketing**

59. Over ten years ago, an industry commentator noted that Twilio "took to their blog to brag about new apps responsible for sending unsolicited text messages.

[27] *See* Twilio Inc., Securities and Exchange Commission, Form S-1 Registration Statement at 41, https://www.sec.gov/Archives/edgar/data/1447669/000119312516733893/d237988ds1.htm

In a recent blog post, they highlighted [a] Google engineer … for blatantly spamming mobile phones with 18,000+ text messages through the Twilio SMS platform …. Twilio needs to admit there's an SMS spam problem on their platform, stop glorifying it, and take the needed steps to fix it."[28]

60.    A few years later, on November 20, 2015, CTIA – The Wireless Association® ("CTIA") opposed the Petition for Expedited Declaratory Ruling filed by Twilio that called for Title II classification of SMS (text messaging), MMS (multimedia messaging) – and the distinct Short Code system.[29]

61.    There, the CTIA noted that Twilio had served as the conduit for spam and it had previously been sued for transmitting unsolicited long-code text messages from GroupMe.[30]

62.    In addition, a Court in the District of Nevada found that Twilio faced potential TCPA liability because it offered functionality allowing clients to bypass spam filter.[31]

63.    *And less than a year ago*, the FCC determined that Twilio is originating illegal robocall traffic on behalf of one or more of its clients.[32]

64.    In the Cease-and-Desist Letter to Twilio, the FCC mandated that Twilio take steps to address the illegal traffic, and take steps to prevent Twilio's network from *continuing* to be a source of illegal robocalls.[33]

65.    Indeed, the FCC made the following potentially devastating ultimatum:

---

[28] Derek Johnson, Twilio Continues to Send SMS Spam, Even After Lawsuit, http://www.tatango.com/blog/twilio-continues-to-send-sms-spam-even-after-lawsuit/ (Apr. 19, 2012).

[29]    https://api.ctia.org/docs/default-source/fcc-filings/151120---filed-ctia-opposition-to-twilio-pdr---incl-exhibit.pdf

[30] *Id*. citing 4 See generally Derek Johnson, Twilio Continues to Send SMS Spam, Even After Lawsuit, TATANGO (Apr. 9, 2012), http://www.tatango.com/blog/twilio-continues-to-send-sms-spameven-after-lawsuit/.

[31] *See Bauman v. Saxe*, 2019 WL 591439, at *6 (D. Nev. Feb. 13, 2019).

[32] https://docs.fcc.gov/public/attachments/DOC-390811A1.pdf

[33] *Id*.

"Failure to comply with the steps outlined in this letter **may result in downstream voice service providers blocking all of Twilio's traffic, permanently**.[34]

**Unsolicited Telemarketing Received By Plaintiff**

66.     On May 20, 2004, Plaintiff registered his Cell Phone on the Do Not Call Registry.

67.     Pursuant to 47 U.S.C. § 227(c)(3)(F), Defendant is required to check the National Do Not Call Registry before attempting to call.

68.     Nevertheless, as early as June 2021, Plaintiff received text messages from phone numbers assigned to Defendant.

69.     For instance, Plaintiff received multiple text messages from (919) 750-8278 soliciting Plaintiff for available rooms to rent.

70.     On or around October 28, 2021, Plaintiff received text messages regarding the purchase of his property from another phone number assigned to Defendant, i.e. (817) 904-4148.

71.     These messages constitute telephone solicitation because it encouraged the future purchase or investment in property, goods, or services under 47 U.S.C. § 227(a)(4), i.e., attempting to buy Plaintiff's property.

72.     In accordance with the definition of telemarketing as provided in 47 C.F.R. § 64.1200(f)(10), the texts Plaintiff received were for the purpose of encouraging the purchase of goods making it telemarketing.

73.     At no point in time did Plaintiff provide Defendant with his express written consent to be contacted.

74.     After learning through a certain automated robocall surveillance system that Defendant owned these phone numbers, Plaintiff communicated with Twilio's compliance department and in-house counsel via email and telephone.

75.     Specifically, in the summer of 2021, Plaintiff communicated by email

---

[34] *Id.* (emphasis in original).

with Twilio's Litigation counsel, Katie Chang as well as lead paralegal, Matthew Gainer.

76.    In these communications, Plaintiff identified his Cell Number and *repeatedly* asked that Defendant stop the abusive behavior that originated from multiple phone numbers owned by Twilio.

77.    Defendant simply refused to implement a system-wide block to his Cell Phone and transmitted, and continued to transmit, countless unlawful telemarketing to his Cell Phone.

78.    By way of example only, in 2022, Plaintiff received pre-recorded calls and text messages from a company called Fulcrum Home Solutions, LLC ("FHS") that did not obtain his consent.

79.    Plaintiff contacted FHS and they expressly identified Twilio as the service being used to generate pre-recorded calls in violation of the TCPA.

80.    Despite Plaintiff bringing this to Twilio's attention and Twilio knowing his Cell Number, Twilio kept inundating him with unsolicited calls and text messages.

81.    Towards the end of 2022, Plaintiff accessed a phone carrier database to determine that Twilio owned the phone numbers at issue.

82.    Plaintiff confirmed that in October 2022, Plaintiff received unsolicited pre-recorded calls and text messages from the following numbers **all owned by Twilio**:

936-215-6987

206-312-6891

865-344-1748

702-506-0992

83.    Plaintiff confirmed that in November 2022 Plaintiff received unsolicited pre-recorded calls and text messages from the following numbers **all owned by Twilio**:

717-527-6784

1    540-299-1005

2    931-340-9636

3    608-496-8453

4    910-788-4727

5    302-248-3720

6    84.    Such unsolicited communications caused Plaintiff actual harm. Specifically, Plaintiff estimates that he spent numerous hours investigating the unwanted phone calls including how they obtained his number and who the Defendant was.

85.    Furthermore, Defendant's messages took up memory on Plaintiff's cellular phone. The cumulative effect of unsolicited messages like Defendant's poses a real risk of ultimately rendering the phone unusable for other purposes as a result of the phone's memory being taken up.

**FIRST CAUSE OF ACTION**
**NEGLIGENT AND WILLFUL VIOLATIONS OF THE TCPA, U.S.C. § 227(C)(5)**

86.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

87.    A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations governing the Do-Not-Call registry, if otherwise permitted by the laws or rules of court of a State, bring an action in an appropriate court of that State.

88.    Without obtaining Plaintiff's prior express written consent, Twilio initiated or caused to be initiated calls, including, but not limited to, the calls and text messages as alleged with specificity herein.

89.    Moreover, Twilio is so involved in the calls and text messages that it functionally initiates or causes to be initiated the calls/texts because, among other things, it determines who a message will be sent from, creates the queue of the numbers the message will be sent to, and assembles the messages themselves.

90.    The calls and text messages sent to Plaintiff were sent using equipment that had the capacity to store telephone numbers retrieved from a database and to dial such numbers, specifically the Twilio APIs and its <Queue> and <Dial> functions. The Twilio APIs can also be programmed to generate and dial random or sequential numbers. By using such equipment, Twilio and its customers were able to effectively send calls and text messages simultaneously to thousands of wireless telephone numbers *en masse* without human intervention.

91.    Finally, Twilio knew that the Twilio API and its servers were being used to violate the TCPA and, indeed, aided in the misuse of its API and servers, as Plaintiff continually notified Twilio of its malfeasance.

92.    Defendant's conduct violates several sections of the TCPA.

93.    As a result of Defendant's violation, Plaintiff suffered injuries and is each entitled to, inter alia, a minimum of $500 in damages for each violation of the TCPA, and up to $1,500.00 if Defendant's violation of the TCPA is determined to be knowing or willful.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a. A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b. An injunction prohibiting Defendant from calling Plaintiff's cellular telephone number;

c. An award of actual and statutory damages;

d. An award of treble damages; and

e. Such further and other relief the Court deems reasonable and just.

**JURY DEMAND**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

COMPLAINT

1   Dated: May 17, 2024                     Respectfully submitted,

2

3                                    **KAZEROUNI LAW GROUP, APC**

4                                By:   s/Ryan L. McBride

5                                       RYAN MCBRIDE, ESQ.

6                                       ryan@kazlg.com

                                         ATTORNEY FOR PLAINTIFF

COMPLAINT