**KAZEROUNI LAW GROUP, APC**
Ryan L. McBride, Esq. (297557)
ryan@kazlg.com
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

*Attorneys for Plaintiff,*
Michael Anthony

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL ANTHONY,** | **Case No.: 3:24-cv-02999-RS** |
| **Plaintiff,** | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227** |
| **v.** | |
| **TWILIO INC.,** | |
| **Defendant.** | **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.     Plaintiff MICHAEL ANTHONY ("Plaintiff") brings this action against Defendant TWILIO, INC. ("Defendant" or "Twilio") to secure redress for violations of the Telephone Consumer Protection Act ("TCPA").

2.     Founded in 2008, Twilio's Application Programming Interfaces ("APIs") provide various communication channels like voice, video, messaging, and email to be weaved into certain applications that enable businesses to communicate with consumers.[1]

---

[1] https://www.forbes.com/advisor/au/investing/what-is-twilio/#:~:text=In%20a%20nutshell%2C%20Twilio%20is,with%20clients%20across%20the%20globe.

3.     Twilio's global network infrastructure provides communication services in more than 180 countries, enabling businesses to communicate with consumers across the globe.[2]

4.     Despite its positive characteristics, however, Twilio has not complied with the strictures of the TCPA.

5.     Specifically, the Federal Communications Commission ("FCC") investigated Twilio for many months in 2022 and determined that Twilio had been originating illegal robocall traffic on behalf of one or more of its clients.[3]

6.     When confronted with the investigation's findings, Twilio told the Enforcement Bureau and Industry Traceback Consortium that its client had purportedly obtained the called parties' consent. However, neither Twilio nor its client ever supplied evidence of that consent.[4]

7.     As a result, the FCC was forced to issue a cease-and-desist letter to Twilio, ordering it to investigate and take steps to address the unlawful traffic.

8.     Noting that Twilio was the most prominent and largest provider to receive an Enforcement Bureau cease-and-desist letter, Enforcement Bureau Chief Loyaan A. Egal stated that "'Know Your Customer' principles should be at the forefront of all communications service providers' business practices. It is concerning to see such a large provider allowing this kind of traffic on its networks. I hope and expect Twilio to immediately cease and desist."[5]

9.     In a public statement, representatives from Twilio swiftly responded: "[The company] takes any concerns related to fraudulent actors on its network extremely seriously and will continue to cooperate fully with the Bureau regarding the allegations in the Bureau's Notice."[6]

---

[2] *Id.*
[3] https://docs.fcc.gov/public/attachments/DOC-390811A1.pdf
[4] *Id.*
[5] *Id.*
[6] https://www.mintz.com/insights-center/viewpoints/2023-02-27-telephone-and-texting-compliance-news-regulatory-update-fcc#RepeatOffenderAction



1   10.   Unfortunately, Plaintiff was not taken as seriously as the FCC's
2   Enforcement Bureau.

3   11.   Specifically, during this same time period, Plaintiff was receiving a
4   deluge of calls and text messages to Plaintiff's cellular telephone ending in -555 ("Cell
5   Phone") even though he personally registered his Cell Phone with the Do Not Call
6   Registry ("DNCR").

7   12.   Faced with this barrage of telemarketing, Plaintiff repeatedly notified
8   Defendant's agents and Defendant's legal department that his Cell Phone was
9   registered with the DNCR and that he was nevertheless receiving unsolicited
10  telemarketing from their phone numbers.

11  13.   Lamentably, Defendant continued to harass him by transmitting unlawful
12  text messages and making illegal calls via phone numbers that are registered to
13  Defendant.  Plaintiff was therefore left with no choice but to file this action to stop the
14  unsolicited and unlawful communications initiated by Twilio.

15  14.   Through this action, Plaintiff seeks statutory damages and equitable relief
16  to halt Defendant's illegal conduct, which has resulted in the invasion of privacy,
17  harassment, aggravation, and disruption of his daily life.

18  15.   Plaintiff makes these allegations on information and belief, with the
19  exception of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which
20  Plaintiff alleges on personal knowledge.

21  16.   While many violations are described below with specificity, this
22  Complaint alleges violations of the statutes cited in its entirety.

23  17.   Unless otherwise stated, all the conduct engaged in by Defendant took
24  place in the Northern District of California.

25  18.   Any violations by Defendant were knowing, willful, and intentional, and
26  Defendant did not maintain procedures reasonably adapted to avoid any such
27  violation.

28  19.   Unless otherwise indicated, the use of Defendant's names in this

Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant's named.

### NATURE OF THE ACTION

20. In 1991, Congress passed the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*., ("TCPA"), in response to complaints about abusive telemarketing practices.

21. At the time of the TCPA's passage, the majority of illegal robo-calls were made "off-line" using pre-recorded voice messages.

22. Thereafter, the Federal Communications Commission ("FCC") noted that advertisers seeking to make illegal robo-calls increasingly used computer programs to initiate calls as well as SMS text messages, instead of pre-recorded voice messages, to reach cell phone and "smart phone" users.[7]

23. A Pew Research Center study conducted almost 10 years ago found that "[t]ext messaging is the most widely-used smartphone feature," and "is also the most frequently-used."[8]

24. Indeed, in 2014, Americans sent over 2 *trillion* individual SMS and MMS messages.[9]

25. As technology evolved and advertisers adapted to the ways it reached potential customers, the FCC made clear that the TCPA still governed.

26. Specifically, the FCC found that merely moving the process of robo-calling to auto-dialing computer programs, or using automated or pre-recorded text messages instead of a pre-recorded voice, did not place these practices outside the scope of the TCPA. Indeed, the FCC issued a number of declaratory rulings with

---

[7] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 31 F.C.C. Rcd. 88 (2016).
[8] http://www.pewinternet.org/2015/04/01/us-smartphone-use-in-2015/
[9] *See* Dr. Robert F. Roche & Kathryn Malarkey, CTIA's Annual Wireless Industry Indices: Annual Wireless Survey Results: A Comprehensive Report from CTIA Analyzing the U.S. Wireless Industry, CTIA, at 144 (Sept. 2015).

respect to the TCPA liability of online services that permit the sending of illegal text messages via computer program.[10]

27.     Defendant Twilio is one example of a computer-based robo-calling service and automated text messaging service because it initiates or causes to be initiated *millions* of text messages and/or calls to cell phone users per month via computer program.

28.     This lawsuit seeks to hold Twilio accountable for its integral role in initiating or causing to initiate the relentless unlawful telemarketing that has plagued Plaintiff for years.

## JURISDICTION AND VENUE

29.     Jurisdiction is proper under 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute.

30.     Defendant is subject to this Court's personal jurisdiction because it provides and markets its services within this district.

31.     Pursuant to 28 U.S.C. § 1391(b) and (c), venue is proper because Defendant is deemed to reside in any judicial district in which it is subject to the Court's personal jurisdiction.

## PARTIES

32.     Plaintiff is an individual and citizen of the Commonwealth of Pennsylvania.

33.     Upon information and belief, Defendant is a domestic corporation with its principal place of business located in San Francisco, California.

## THE TCPA

34.     The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. §

---

[10] *See, e.g.*, In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961 (2015).

64.1200(f)(12).

35.   In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication.[11]

36.   "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."[12]

37.   The FCC has explained that calls motivated in part by the intent to sell property, goods, or services are considered telemarketing under the TCPA.[13]

38.   This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call or in the future.[14]

39.   In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services" constitute telemarketing under the TCPA.[15]

40.   In an action under the TCPA, a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice."[16]

41.   In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express written consent" for such calls to wireless numbers.[17]

42.   To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff

---

[11] *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

[12] *Golan*, 788 F.3d at 820 (citing 47 C.F.R. § 64.1200(a)(2)(iii); 47 C.F.R. § 64.1200(f)(12); In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C. Rcd at 14098 ¶ 141, 2003 WL 21517853, at *49).

[13] See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003).

[14] *Id.*

[15] *See* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, ¶ 136 (2003).

[16] *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), aff'd, 755 F.3d 1265 (11th Cir. 2014).

[17] *See* In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C.R. 1830, 1838 ¶ 20 (Feb. 15, 2012) (emphasis omitted).

a "'clear and conspicuous disclosure' of the consequences of providing the requested consent….and having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates."[18]

43.     If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent.[19]

44.     As held by the United States Court of Appeals for the Ninth Circuit: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'"[20]

**TCPA Applies to Common Carriers That Transmit Messages Others Create**

45.     The TCPA does not define the term "make," but the question of who can be held liable for violations of the TCPA was addressed extensively in 2015.[21]

46.     The 2015 FCC Order states that "one can violate the TCPA either by 'taking the steps necessary to physically place a telephone call,' or by 'being so involved in the placing of a specific telephone call as to be deemed to have initiated it.'"[22]

47.     And in making this determination, the adjudicator must "look to the totality of the facts and circumstances surrounding the placing of a particular call."[23]

48.     In 2016, the FCC weighed in on the question of whether text broadcasters

---

[18] In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C.R. 1830, 1837 ¶ 18, 1838 ¶ 20, 1844 ¶ 33, 1857 ¶ 66, 1858 ¶ 71 (F.C.C. Feb. 15, 2012).
[19] See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7991-92 (2015) (requiring express consent "for non-telemarketing and non-advertising calls.")
[20] *Van Patten v. Vertical Fitness Grp.*, No. 14-55980, 2017 U.S. App. LEXIS 1591, at *12 (9th Cir. May 4, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (emphasis original)).
[21] See Rules & Regs.  Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7890 (2015) ("the 2015 FCC Order").
[22] *Id*. at 7890 ¶ 30 (quoting DISH Network, 28 FCC Rcd. at 6583 ¶ 27).
[23] *Id*.

could be "senders" of text messages under § 227(b)(1) of the TCPA.[24]

49.    The FCC clarified that "text broadcasters can be liable for TCPA violations" based on an analysis of the "totality of the facts and circumstances surrounding the placing of a particular call."[25]

50.    As one court put it, "[t]he 'totality of the circumstances' approach…will not provide easy answers in close cases. But it makes one thing clear: a provider of auto-dialing services cannot blithely sit back and blame his customers for any TCPA violations that result from their use of his service."[26]

51.    The FCC has held that an entity that provides a platform or an application that facilitates calling may be the maker of a call, depending on the level of its involvement. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, at ¶¶ 28–30 (F.C.C. July 10, 2015), *appeal resolved*, ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687 (D.C. Cir. 2018) (setting aside two parts of 2015 declaratory ruling, but leaving this portion undisturbed); *Bauman v. Saxe*, 2019 WL 591439 (D. Nev. Feb. 13, 2019) (refusing to dismiss TCPA claim against transmitter of messages that integrated its hardware and software with seller's to create, sort, and send hundreds of thousands of text message advertisements in an automated manner and strategically scheduled the transmission of the messages and took various other steps to avoid spam filters); *Wick v. **Twilio Inc**.*, 2017 WL 2964855, at *3 (W.D. Wash. July 12, 2017) (refusing to dismiss claim against communications service that creates messages for its customers, or chops and reassembles content its

---

[24] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 31 F.C.C. Rcd. 88, 90 (2016).
[25] Id. at 91 (emphasis omitted).
[26] *Cunningham v. Montes*, 378 F.Supp.3d 741, 747–48 (W.D. Wis. 2019). *See also Hurley v. Messer*, 2018 WL 4927218, at *2 (S.D. W.Va. Oct. 10, 2018) ("whether or not [the defendant] may be held liable will depend upon a totality of the circumstances analysis, which is not appropriate on a motion to dismiss given the allegations in this case."); *Couser v. Pre-paid Legal Services, Inc*., 994 F.Supp.2d 1100, 1103 (S.D. Cal. 2014) ("Whatever the true and exact relationship between [defendant] and its customers is, the Court finds it all too fact intensive ... to be resolved at the motion to dismiss phase in [defendant's] favor.")

KAZEROUNI
LAW GROUP, APC

customers provide, determines the number from which a message will be sent in order to evade filtering or screening and mask the source of the call, chooses the order and timing of the messages to make sure the volume stays below spam filter thresholds, and automatically sends the messages).

52. In addition to being liable if a platform provider is heavily involved with the transmission of unlawful text messaging, Courts hold that a provider that has *actual notice of an illegal use and fails to take steps to prevent such transmissions will be held liable*. *See Att'y Gen. of Florida v. Smartbiz Telecom L.L.C*., 688 F. Supp. 3d 1230 (S.D. Fla. 2023) (allowing state, acting as *parens patriae* for its citizens, to proceed against telecom provider that continued to transmit fraudulent calls despite repeated notifications through trace-back requests that it was transmitting illegal calls); *Laccinole v. Apprise, Inc*., 453 F. Supp. 3d 499, 503 (D.R.I. 2020) (refusing to dismiss claim against company that provided a victim notification service for the state; even if company is a common carrier, it may be liable under the TCPA if it is highly involved in the illegal use of its services, or has actual notice of such use but fails to prevent it); *Linlor v. Five9, Inc*., 2017 WL 2972447 (S.D. Cal. July 12, 2017) (fact question here whether company that provided "customer contact center solutions" was common carrier); *Rinky Dink, Inc. v. Elec. Merch. Sys., Inc*., 2015 WL 778065, at *4 (W.D. Wash. Feb. 24, 2015); *Report & Order, In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8779–8780, at ¶ 19 (1992).

53. Indeed, plaintiffs may state a claim against common carriers that transmit spoofed robocalls to consumers, where they allege that it was obvious to the carriers that they were transmitting illegal calls, they profited from transmitting them, and they could easily have blocked the calls. *See Mey v. All Access Telecom, Inc*., 2021 WL 8892199 (N.D. W. Va. Apr. 23, 2021).

54. In cases wherein common carriers obtained knowledge that a plaintiff was receiving unwanted communications, Courts have consistently refused to dismiss

suits where the defendant knew that illegal activity was underway.

55.     For instance, in *Hurley v. Messer*, the district court refused to dismiss TCPA claims against VoIP providers who knew of the caller's illegal conduct and could have stopped it, but nevertheless permitted robocalls to be broadcast through their systems.[27]

56.     The *Hurley* court analyzed the factors listed in the 2015 FCC Order and concluded that the allegations "state a plausible claim that [the VoIP providers] offered a calling platform and 'knowingly allowed [their] client(s) to use that platform for unlawful purposes.'"[28]

57.     This is precisely what happened in this case. Regrettably, Twilio **knowingly** allowed its customers to harass Plaintiff for years and was ***intimately*** involved in this malfeasance.

## FACTUAL ALLEGATIONS

### Twilio's Intimate Involvement In Transmitting the Unlawful Telemarketing

58.     In 2016, the FCC ruled on the question of whether text broadcasters could be "senders" of text messages under § 227(b)(1) of the TCPA.[29]

59.     The FCC clarified that "text broadcasters can be liable for TCPA violations" based on an analysis of the "totality of the facts and circumstances surrounding the placing of a particular call."[30]

60.     As part of the totality of the circumstances test, a court will consider: "1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA," as well as whether a text broadcaster "knowingly allowed its client(s) to use that platform for unlawful

---

[27] 2018 WL 4854082 (S.D. W.Va. Oct. 4, 2018).
[28] *Id*. at *4 (quoting 2015 FCC Order ¶ 30).
[29] In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 31 F.C.C. Rcd. 88, 90 (2016).
[30] *Id*. at 91 (emphasis omitted).

purposes."[31]

61.    Considering the totality of the circumstances, Plaintiff alleges that Twilio makes, initiates, and/or causes to be initiated the calls and text messages transmitted to Plaintiff within the meaning of the TCPA.

62.    Twilio acknowledges that its platform technology allows mass text messaging campaigns that violate the TCPA: "We face a risk of litigation resulting from customer misuse of our software to send unauthorized text messages in violation of the Telephone Consumer Protection Act.  Text messages may subject us to potential risks, including liabilities or claims relating to consumer protection laws. For example, the Telephone Consumer Protection Act of 1991 restricts telemarketing and the use of automatic SMS text messages without proper consent. This has resulted in civil claims against the Company and requests for information through third-party subpoenas. The scope and interpretation of the laws that are or may be applicable to the delivery of text messages are continuously evolving and developing. If we do not comply with these laws or regulations or if we become liable under these laws or regulations due to the failure of our customers to comply with these laws by obtaining proper consent, we could face direct liability."[32]

**Twilio's Long History of Unlawful Telemarketing**

63.    Over ten years ago, an industry commentator noted that Twilio "took to their blog to brag about new apps responsible for sending unsolicited text messages. In a recent blog post, they highlighted [a] Google engineer … for blatantly spamming mobile phones with 18,000+ text messages through the Twilio SMS platform …. Twilio needs to admit there's an SMS spam problem on their platform, stop glorifying it, and take the needed steps to fix it."[33]

---

[31] *Id.*
[32] *See* Twilio Inc., Securities and Exchange Commission, Form S-1 Registration Statement at 41,
https://www.sec.gov/Archives/edgar/data/1447669/000119312516733893/d237988ds1.htm
[33] Derek Johnson, Twilio Continues to Send SMS Spam, Even After Lawsuit,

KAZEROUNI
LAW GROUP, APC

64.     A few years later, on November 20, 2015, CTIA – The Wireless Association® ("CTIA") opposed the Petition for Expedited Declaratory Ruling filed by Twilio that called for Title II classification of SMS (text messaging), MMS (multimedia messaging) – and the distinct Short Code system.[34]

65.     There, the CTIA noted that Twilio had served as the conduit for spam and it had previously been sued for transmitting unsolicited long-code text messages from GroupMe.[35]

66.     In addition, a Court in the District of Nevada found that Twilio faced potential TCPA liability because it offered functionality allowing clients to bypass spam filter.[36]

67.     There, the Court found "that Twilio took steps necessary to send the automated text messages. Twilio's alleged involvement was to an extent that Twilio could be considered to have initiated the contact, considering the TCPA's goal of limiting the nuisance and invasion of privacy caused by automated calls and text messages. Plaintiffs also allege that Twilio not only knowingly allowed DSP to use their platform for automated text messages but actively helped DSP bypass spam filters. Because the FCC has determined that transmitters can be liable under the TCPA under certain circumstances, and because Plaintiffs allege circumstances under which liability is plausible, Plaintiffs state a claim against Twilio under the TCPA."[37]

68.     ***And less than a year ago***, the FCC determined that Twilio is originating illegal robocall traffic on behalf of one or more of its clients.[38]

---

http://www.tatango.com/blog/twilio-continues-to-send-sms-spam-even-after-lawsuit/ (Apr. 19, 2012) annexed hereto as Exhibit A.
[34]     https://api.ctia.org/docs/default-source/fcc-filings/151120---filed-ctia-opposition-to-twilio-pdr---incl-exhibit.pdf
[35] *Id.* citing 4 See generally Derek Johnson, Twilio Continues to Send SMS Spam, Even After Lawsuit,
TATANGO (Apr. 19, 2012), http://www.tatango.com/blog/twilio-continues-to-send-sms-spameven-after-lawsuit/
[36] *See Bauman v. Saxe*, 2019 WL 591439, at *6 (D. Nev. Feb. 13, 2019).
[37] *Id.* at 2019 WL 591439, at *3.
[38] https://docs.fcc.gov/public/attachments/DOC-390811A1.pdf

69. In the Cease-and-Desist Letter to Twilio, the FCC mandated that Twilio take steps to address the illegal traffic, and take steps to prevent Twilio's network from *continuing* to be a source of illegal robocalls.[39]

70. Indeed, the FCC made the following potentially devastating ultimatum: "Failure to comply with the steps outlined in this letter **may result in downstream voice service providers blocking all of Twilio's traffic, permanently**.[40]

**Plaintiff Notifies Twilio of Its Unsolicited Telemarketing**

71. On May 20, 2004, Plaintiff personally registered his Cell Phone on the DNCR.

72. Pursuant to 47 U.S.C. § 227(c)(3)(F), Defendant is required to check the National Do Not Call Registry before attempting to call.

73. Nevertheless, as early as June 2021, Plaintiff received text messages from phone numbers assigned to Defendant.

74. Plaintiff learned through a certain automated robocall surveillance system that Defendant owned these phone numbers.

75. As such, Plaintiff communicated with Twilio's compliance department and in-house counsel via email and telephone in an attempt to stop the abuse.

76. In these communications, Plaintiff identified his Cell Number and *repeatedly* asked that Defendant stop the abusive behavior that originated from multiple phone numbers owned by Twilio.

77. Defendant simply refused to implement a system-wide block to his Cell Phone and transmitted, and continued to transmit, countless unlawful telemarketing to his Cell Phone.

78. Exasperated by the barrage of telemarketing, Plaintiff continued to contact Defendant and begged them to stop sending unwanted and unsolicited telemarketing communications transmitted, which all originated from phone numbers

---

[39] *Id.*
[40] *Id.* (emphasis in original).

owned and assigned to Defendant, to no avail.

79.     Specifically, in July 2021, Plaintiff was in direct contact with Defendant's agent and employee, Matthew Gainer.

80.     According to his email signature, Mr. Gainer was a "Sr. Manager, Lead Paralegal" for Twilio.

81.     Later that same month, Plaintiff was also in direct contact with Defendant's agent, Katie Chang.

82.     According to Ms. Chang's email signature, she was the "Lead Counsel, Litigation" for Defendant.

83.     At the time, Plaintiff provided his full and complete phone number and continually requested, ***in writing***, that Defendant stop sending him telemarketing via its system.

84.     Over the next six months, Plaintiff continued to communicate with Defendant complaining of the continued telemarketing harassment and provided detailed specifics relating to the dates and times that he received telemarketing from Twilio's assigned phone numbers.

85.     Nevertheless, Plaintiff continued to receive unsolicited telemarketing even though Twilio is able to take steps to prevent new or renewing customers from using its network to transmit illegal robocalls.[41]

**Examples of Twilio's Unsolicited Telemarketing**

86.     As alleged with specificity herein, Plaintiff was inundated with unlawful telemarketing text messages.

87.     In accordance with the definition of telemarketing as provided in 47 C.F.R. § 64.1200(f)(10), the texts Plaintiff received were for the purpose of encouraging the purchase of goods making it telemarketing.

88.     At no point in time did Plaintiff provide Defendant with his express

---

[41] *See* https://docs.fcc.gov/public/attachments/DOC-390811A1.pdf at pg. 3.

written consent to be contacted.

89.     By way of example only, Plaintiff received a series of text messages from a company advertising Medigap insurance, which is a supplemental insurance policy sold by private companies that can be used along with Medicare Parts A and B to fill the gaps in their coverage.

90.     Specifically, in December 2022, Plaintiff received a text message from the Twilio phone number ending in -5772 advertising additional Medicare coverage for 2023 and provided the hyperlink: https://meditime.cc/0Fcon2.

91.     Upon clicking on this hyperlink, the telemarketing text message recipient is taken to the website for Smartmatch Insurance Agency, LLC, which expressly indicates: "[t]his is a solicitation for insurance.  Not connect with or endorsed by the U.S. Government."

92.     Plaintiff received at least *five* separate text messages from this company on October 31, 2022, November 22, 2022, December 2, 2022 and December 14, 2022.

93.     Plaintiff received these text messages from telephone numbers, 936-215-6987, 865-503-5772, 805-874-6733 and 717-527-6784.

94.     During this time and thereafter, Plaintiff notified Twilio of this unlawful telemarketing.  As such, Twilio had *actual notice* of such unlawful use of its platform but failed to prevent it.

95.     In addition to these telemarketing text messages, Plaintiff received a text message solicitation from Twilio's phone number ending in -6707 at this time.

96.     In this message, Michael from US Mortgage was asking form "5 min to discuss [] options."

97.     According to its website, US Mortgage is "The Best Mortgage Lender to find the best deals."

98.     Like the other text messages, Plaintiff had given Twilio **actual notice** of these unlawful telemarketing text messages ***but they refused to stop them***.

99.     In addition to the telemarketing offering its mortgage services, Plaintiff

received multiple text messages from a number ending in -8278 that solicited Plaintiff for available rooms to rent.

100. At this time, Plaintiff was also inundated with text messages that were transmitted via Twilio from multiple, aggressive "we buy homes" telemarketers.

101. Using common sense, Courts across the country have routinely found such odious calls or text messages "telephone solicitations" for TCPA purposes. *See Pepper v. CVG Capital L.L.C.*, 677 F. Supp. 3d 638 (S.D. Tex. 2023) (offer to buy consumer's home is not "telephone solicitation," but offer to provide services to sell the house is, even if homeowner pays for these services by receiving a discounted price); *Wilcox v. MarketPro S., Inc.*, 2023 WL 8806696 (D. Md. Dec. 20, 2023) (refusing to dismiss claim against "we buy homes" caller, where intent behind message may be sale of its services, which homeowner would pay for through a discounted sale price for the home); *McMorrow v. Core Props., L.L.C.*, 2023 WL 8697795 (E.D. Mo. Dec. 15, 2023) (text message from "we buy homes" company was telephone solicitation, because its purpose was to encourage purchase of its home-selling services, for which homeowner would pay an "effective fee" in the form of a reduced sale price); *Helfrich v. Raven Home Buyers L.L.C.*, 2023 WL 5956221 (S.D.N.Y. Sept. 13, 2023) ("we buy houses" caller's website advertised that it eliminated the paperwork, time, and fees to sell a house through a real estate agent); *Eagle v. GVG Capital, L.L.C.*, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023) (refusing to dismiss claim where "we buy homes" caller's website stated that its purpose was to "provide home selling services"); *Anderson v. Catalina Structured Funding, Inc.*, 2021 WL 8315006 (W.D. Mich. Dec. 21, 2021) (offer to purchase structured settlement has enough characteristics of a sale of services to meet definition of a telephone solicitation), *adopted by* 2022 WL 3643733 (W.D. Mich. Aug. 24, 2022); *Buja v. Novation Capital*, 2017 WL 10398957 (S.D. Fla. Mar. 31, 2017) (calls from entity that sought to purchase structured settlements were telemarketing because they sought to encourage the use of the caller's services).

102. Here, Plaintiff received at least two text messages from a "William" at "Hometown Cash Offers" regarding the property 62 E. Stewart Avenue.

103. William texted from Twilio's phone number ending in -3049 that same month.

104. According to its website, www.belowmarketrei.com, this company purchases properties a discount and adds "on our property acquisition fee which is [their] profit for finding and negotiating the deal."

105. As recognized by many courts, this telemarketer's purpose was to encourage purchase of its services.

106. During this time, Plaintiff also received multiple text messages from "Bruce" indicating that his company "Quick Sell Valley" was "looking to buy houses in [Plaintiff's] neighborhood that are not on the market." Bruce provided the website "quicksellvalley.com."

107. According to its website, this company is a "full service wholesale company specializing in selling houses with a quick and stress-free process."

108. This telemarketer's purpose was to encourage purchase of its services.

109. In addition to these telemarketing text messages, Plaintiff received two unsolicited telemarketing text message from "Sophia" at "Quick Cash Offer."

110. Sophia texted Plaintiff from the phone number ending in -0234, which is another phone number owned and operated by Defendant.

111. According to its website "quickcashoffer.com," this company is a "team of trusted home buying experts" that touts its services and qualifications.

112. Specifically, this company indicates "[o]nce you're a client of QuickCashOffer we guarantee you a level of professionalism and expertise unrivaled in the real estate industry today."

113. Again, this telemarketer's purpose was to encourage purchase of its services.

114. A few months later, Plaintiff received multiple text messages from

woman named "Rachel" for "httyp://localbuyerhouse4cash.com"

115. Like the other "we buy homes" text transmissions, these multiple text messages were sent with Twilio's intimate involvement.

116. Like the other "we buy homes" text transmissions, these multiple text messages were: (i) sent to encourage purchase of its services; (ii) transmitted on Twilio's platform; (iii) with a number owned by Twilio; and (iv) even though Twilio had actual notice of an illegal use and failed to take steps to prevent such transmissions to Plaintiff.

117. On August 10, 2021, Plaintiff 4 text messages from HB Capital using Twilio's phone number.

118. HB Capital's representative was looking to offer certain services in connection with the purported sale of Plaintiff's home.

119. Like the other "we buy homes" text transmissions, these multiple text messages were sent with Twilio's intimate involvement.

120. Like the other "we buy homes" text transmissions, these multiple text messages were: (i) sent to encourage purchase of its services; (ii) transmitted on Twilio's platform; (iii) with a number owned by Twilio; and (iv) even though Twilio had actual notice of an illegal use and failed to take steps to prevent such transmissions to Plaintiff.

121. A few months later, Plaintiff received even more text messages regarding the purchase of property included in a hyperlink from another phone number assigned to Defendant ending in -4148.

122. Similarly, in early 2022, Plaintiff received pre-recorded calls and text messages from a company called Fulcrum Home Solutions, LLC ("FHS") that did not obtain his consent.

123. Plaintiff contacted FHS and they expressly identified Twilio as the service being used to generate pre-recorded calls in violation of the TCPA.

124. Like the other unlawful telemarketing companies, the website for FHS

indicates that they provide certain services to distressed homeowners to help sell their property.

125. Like the myriad of Courts across the country that have analyzed this type of telemarketing, the purpose behind FHS communication was to encourage the purchase of its home-selling services, for which Plaintiff would pay an "effective fee" in the form of a reduced sale price.

126. In July 2021, Plaintiff received text messages from employees of "Rebuilt Investments" and "Philly Home Investments."

127. These various text messages were transmitted via telephone numbers owned and operated by Twilio.

128. These telemarketers sought information as to whether Plaintiff was interested in purchasing distressed assets as he was purportedly a "real estate investor."

129. One of the agents in these various text messages identified as "Alex" and indicated that Rebuilt Investments is "an investment firm that sources off market deals for investors. We source deals across asset classes – single fam, multifamily, commercial, land, etc."

130. Clearly, such text messages were telemarketing.

131. Likewise, many text messages from "Philly Home Investors" advertised such real estate deals.

132. Despite Plaintiff bringing this to Twilio's attention and Twilio knowing his Cell Number, Twilio kept inundating him with these types of unsolicited calls and text messages.

133. Such unsolicited communications caused Plaintiff actual harm. Specifically, Plaintiff estimates that he spent numerous hours investigating the unwanted phone calls including how they obtained his number and who the Defendant was.

134. Furthermore, Defendant's messages took up memory on Plaintiff's

cellular phone. The cumulative effect of unsolicited messages like Defendant's poses a real risk of ultimately rendering the phone unusable for other purposes as a result of the phone's memory being taken up.

**FIRST CAUSE OF ACTION**
**NEGLIGENT AND WILLFUL VIOLATIONS OF THE TCPA, U.S.C. § 227(C)(5)**

135.   Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

136.   A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations governing the DNCR, if otherwise permitted by the laws or rules of court of a State, bring an action in an appropriate court of that State.

137.   As alleged with specificity herein, Twilio initiated or caused to be initiated telemarketing calls and text messages without obtaining Plaintiff's prior express written.

138.   As alleged with specificity herein, Twilio was so involved in the calls and text messages that it functionally initiated or caused to be initiated the calls and text messages at issue herein.

139.   In light of the FCC's Cease and Desist Letter and Plaintiff's protestations as alleged with specificity herein, Twilio knew that its API was being used to violate the TCPA and, indeed, aided in the misuse of the same.

140.   Defendant's conduct violates several sections of the TCPA.

141.   As a result of Defendant's violation, Plaintiff suffered injuries and is each entitled to, inter alia, a minimum of $500 in damages for each violation of the TCPA, and up to $1,500.00 if Defendant's violation of the TCPA is determined to be knowing or willful.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

a. A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b. An injunction prohibiting Defendant from calling Plaintiff's cellular telephone number;

c. An award of actual and statutory damages;

d. An award of treble damages; and

e. Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: December 18, 2024                    Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: _s/Ryan L. McBride_____
       RYAN MCBRIDE, ESQ.
       ATTORNEY FOR PLAINTIFF